And we will move to our last case for argument this morning, Peters v. Cohen. Thank you, Your Honor. May it please the Court. Jonathan Massey for the Plaintiff Appellant, Jan Peters. With me at counsel table is my co-counsel, William Palmer. With the Court's permission, I'll try to reserve four minutes at the end, or maybe three if I don't get to that. This case is governed by Taylor. This is the California unclaimed property statute. And there's been discussion of the Taylor cases in the previous arguments, but here we are. They apply full score, full square. And you may recall that Chris Taylor was a British national living and working in England who owned 52,000 shares of Intel stock that the California controller seized without notice. Here, Mr. Peters is a German national living and working in Munich, Germany, who learned from his boss after the fact that the California had seized the Amazon stock in his retirement account with no notice whatsoever. There was no publication notice and no mail notice due to the falsification of his mailing address, which was changed from Munich, Germany, to Munich, California, which there is no such town or city in California named Munich. And his German postcode was changed to the U.S. fictional zip code 000. And so he never received any notice at all. The State does not dispute that. In excerpts of record, page 20, note 7, the State acknowledges that he did not receive any pre-deprivation notice. So this is exactly the kind of unnoticed seizure the Court has already held, and Taylor is clearly unconstitutional and not protected by sovereign immunity. Let me first start with the standing issue, because Mr. Taylor, too, this Court held that there was standing to seek prospective injunctive relief. And Mr. Peters has standing for the very same reasons that Mr. Taylor did. This Court said that Mr. Taylor had established a likelihood of recurrence because California had a policy that did not provide pre-deprivation notice to foreign owners. And the Court also pointed to the plaintiff's cost of constantly monitoring his property or churning it to make sure it wasn't seized by the controller. And that's pages 1199 to 1200 of Taylor, too. The same is true here. Mr. Peters alleged that he owns other stock that was threatened by the unclaimed property law. That's excerpts of record 305. But that other — as I understand it, that other stock do not — it's not connected to a California holder. Is that correct? Well, it's unclear, Your Honor. I think — Well, it hasn't been alleged as such. Well, he responded in an interrogatory that he's concerned that his personal property — this is a supplemental excerpt from record 304. But being concerned is a different thing than whether the property investments are in an account that is held by a California entity. Well, he owns Amazon stock in an ING account. And ING has California offices. There's no retail banking operation here by ING. But it has — But has there been an allegation made that ING is subject to California's unclaimed property law? Well, he testifies that he is currently monitoring it because, of course, he doesn't know. Right? I don't think you're answering my question. Yeah. He alleged — he doesn't know whether ING — he did not testify that he personally knew whether ING had a California domicile. But he's just worried that the same thing could occur later. The same thing could occur again. That seems pretty speculative. Well, he's monitoring his accounts. And I have to say that in the Taylor case, this Court did not identify any specific additional stock that Mr. Taylor owned that was subject to California's seizure. This Court did not ask the question that Your Honor is asking today. If you look at the opinion, it just said he owned 52,000 shares, or at least he used to until California took it. That's how this Court looked at it in Taylor. And the Court's — the language in the Taylor II opinion about churning your stock or constantly monitoring your stock is not tethered to any specific testimony by Mr. Taylor. There was no — there's no citation to it. He didn't testify to that. What would be the injunction? Well, he didn't get to the remedial phase, obviously. No, but as a practical matter. Right. As a practical matter, it could be requiring notice. It could be stopping seizures until a proper notice plan is in place. He also sought return of his property, restitution. And it could — and all of those are on the table. You know, it's all — I mean, I'm really focusing on this forward-looking potential concern that he has. Yes. What precisely would be the injunction? Well, I would think — so in Taylor II, Your Honors, directed — the Court directed the district court to formulate an injunction, and it did include things like stopping seizures until the court had — until California has proposed a possible notice plan. The court in Taylor II actually suggested the district court supervise that notice process and make sure that the state was complying with it. And so I do think that there are — you know, there's plenty of — there could be accounting to make sure that the court properly takes account of — you know, the state identifies all the other foreign owners. I mean, one thing that's quite amazing is today, if you look on the California Unclaimed Property website — and this is an official government website, so I think you can take judicial notice of it — and you look for property owners in Munich, you will see thousands of Munich, Germany residents who own property that has been seized, and their addresses have been falsified and changed to Munich, California. This is happening all the time. It's true for London, Buenos Aires. There's — you know, the website will say Hong Kong, California, Shanghai, California, zip code 000. There's really an urgent need for prospective injunctive relief. This will not end until there's a court order directing them to change. And I do think that that is another part of Taylor that the court identified. It said when there's a policy or a pattern in practice of a — that will guarantee future constitutional violations, then the — that was part of the court's standing analysis. And so in finding standing, the court looked to see, is this likely to recur? And it is recurrent. You're making a persuasive pitch. The problem is, is this the right plaintiff? Because as Judge McEwen stated, what you've got in this record seems pretty speculative in terms of forward-looking relief. Well, it's actually — as I said, I think it's less speculative than Taylor. Because if you look at, say — Of course, in Taylor, you had a California resident as one of the plaintiffs. So standing didn't hinge on a foreign actor. Well, but it — the court didn't treat it that way. I mean, I believe the court said Trish Taylor has standing, too. That's how I read Taylor, too. And certainly the State didn't ever try to separate the two. And I do think that Mr. — and I don't think the other plaintiffs either testified about churning or — I'm sorry to interrupt, but part of the problem, I think, with your argument in my view is that the statute also says that the holders of this unclean property — one of the criteria is the last known address, as shown on the records of the holder, of the apparent owner is in a foreign nation and the holder is domiciled in the State. So even if they had had his accurate Munich address, Munich, Germany, he is domiciled in a foreign nation and the holder is domiciled in California, he would still be subject to California's Unclean Property Act. Well, he was, and that's why it was — I know, but you're raising a claim that all of this stems from this Munich 000, which, you know, does seem a little bit concerning. But it would seem as if he would be subject to the law anyway, even if there was an accurate address. Well, but he would have gotten — you know, there was no constitutional notice. That's the problem. We do have a jurisdictional argument. For present purposes, I'm just focusing on notice, and I don't think there's any dispute that he was denied due process because he got zero notice. The State doesn't deny that. The issue is — Let me just cut to another related thing on this, whether it's speculative or non-speculative. Was that raised in the opening brief as opposed to the reply brief? Well, we did argue standing in the opening brief, and then — This variation that you're arguing now, which is this downstream conduct, I only saw that in the reply brief. Well, I think we did argue that he was — that he checked his — he monitored his accounts. That's at excerpts of Record 51. And the State actually concedes that, at excerpts of Record 23. And another thing I would point out is that in this case, at excerpts of Record 87, Charles Schwab was originally domiciled in Texas. And at some point — we don't know exactly the sequence here — the International Division got domiciled in California. And this is why I think Your Honor's standards are a little bit too high with respect, because for people — for property owners, knowing where a holder is domiciled is like asking them to look in a black box and track down where Charles — one of Charles Schwab divisions is going to be today or tomorrow or two years from now or three years from now. That's an unreasonable burden to expect every property owner around the world to think about where their accounts are and to check which accounts might be held by domiciles in Iowa, California, New York, whatever, and check that all the time. I mean, that itself is a standing issue there, that if that's the rule, then I think you've given standing to everybody, because you're telling everybody — Let me ask you to switch to a different issue, which is the request for relief of the difference in the value of the shares that were sold versus what the present value or some future value of it were. Why isn't that foreclosed by CIVR 2? Yes. I understand that CIVR 2 is a very fair question. I think that CIVR 2 acknowledged that the Money in Unclaimed Property Fund is money belonging to other owners. It's not the state's money. CIVR then said that the claim was barred, but because Mr. Peter's property can be returned to him without spending a penny of public money, this is all private money. I think also CIVR 2 is distinguishable, because it pays — Well, can I interrupt? Yes. He received the proceeds from the sale of the shares of stock, correct? That's correct. So that's off the table. The claim here is the difference in value of what was sold at the time by the state versus what it would have accrued down the road. And CIVR says it rejects these — it says those sorts of claims are ones for money damages for the appreciation of value, and at least that's how the district court saw it. Why is that wrong? Well, because it's not damage. It's not money damages payable by the state. It's — you could call it restitution, or if you call it damage, it's money coming from private funds. So the Eleventh Amendment Sovereign Immunity doesn't apply. Is there any allegation that what they were sold for was wrong? No. At the time that the stock was sold, that that was an improper price at that time? No. It's just that today it's worth $5 million instead of $1.6. So what you want — who is on the hook for that, in your view? Well, the unclaimed property fund can be used to pay anything. The unclaimed property — the Comptroller paid Veris, the auditor, out of the unclaimed property fund. When they — when this Court directed Mr. Palmer's attorney's fees, those — that was a court order, and it was paid out of the unclaimed property fund. It is money that is private money that is not public money. So whatever — But it's not — then if you go to the text of the statute, it's — what you're asking for now is not really for the return of the property or the proceeds from the sale, right? Well, we're asking for — Answer that first. Are you asking for a return of the property?  And what is the property? The monetary equivalent of the property. Well, that's different. I mean, this property is the Amazon stock. Can you get that back? Well, they could buy Amazon stock of 1,029 shares and return it to them, yes, and deduct whatever that — I mean, this is a remedial phase issue in terms of what the offset might be. Well, it is, but it relates to the 11th Amendment as to whether we're talking money. But none of it would be public money. It would all be private money because it's the — none of the money in the unclaimed property fund is public money. And the other thing I would say about Seaver, and then I'll sit down, is that at page 1058, this Court said that the plaintiffs failed to meet their burden to show as a matter of undisputed fact that seizures outside the scope of the unclaimed property law have occurred. So it didn't find that they were ultravirus seizures, whereas this case was clearly an ultravirus seizure. Thank you very much. All right. Mr. Yen. Good morning, Your Honors. Jerry Yen on behalf of the State Comptroller's I think based on the questioning that I've been hearing with my colleague, the issues are standing and whether or not the 11th Amendment bars his request for relief. And we have to keep in mind this is an as-applied challenge. It's not a facial challenge, so it's as-applied. So we really do have to look at the facts of this particular case and of this particular plaintiff. In terms of standing, the likelihood of recurrence is very speculative. You know, as the Court has seen in the briefing, he has no property here. He acknowledges that he has no property here in the United States, and so any concern that it could get eschewed to California is really too speculative for that concern. I would also just like to address the Taylor 2 case and how they are trying to apply that here with Mr. Taylor and the Intel stock. I would note that in that particular case, my understanding is that the Intel still held some of his stock. So some of his stock had been eschewed, but Intel still held some of that stock. So there was a risk and a valid concern that the rest of his Intel stock could get eschewed. In this case, he has no more stock held at Charles Schwab. It's all at a German bank. And so, again, the facts in those two cases are distinguishable. One of the key parts of the argument with your colleague there had to do with Siever 2. Where does that fit into this case in your view? Siever 2 is directly on point, Your Honor, in terms of the restitution requesting the difference between the sale proceeds that he already received and the current stock price or whatever increase in valuation. I think that it's right on point, and Eleventh Amendment just bars that request. And it bars it because it's no longer the return of property or proceeds, but now something more in the nature of money damages because you're talking about I lost the opportunity to have an increase in value of the shares by having, you know, had I kept the shares. Is that your understanding? That's my understanding, Your Honor. And I would also point out they did, my colleague did also discuss some issues related to where the funds come from and the general fund, and I don't think that the court needs to look at that because we just really do need to look at the stock price, what they're really asking for in terms of relief here. And I would also, so as we have discussed, they don't have standing for the prospective relief because it's too speculative, and as the court has seen, Siever 2 is directly on point and they're not entitled to the difference in their stock price since they've already received the sale proceeds from the stock. I mean, factually, it does seem like the stock sale happened very quickly in this case and maybe even more quickly than the statute allowed. Is that right? No. Actually, it occurred within the time period of the statute. So California has a little bit of a different type of reporting requirement for unclaimed property. There's first a reporting requirement, again, to the Comptroller's Office with a list of properties that could potentially get escheated. And so prior to that report, they are supposed to issue a notice to the holders that their property could be potentially escheated. And I'm not sure exactly what the time frame is on that, but that's the first reporting. And then there's a remit report that occurs several months after that where there's been no communication from the notice. And then with the remit report, that's when all the property gets escheated. And then a few months after that, that's when the stock would actually get sold. So it's not exactly there is a certain time period from notice to when the stock gets sold. Would you address, I think it was Mr. Massey's point, that basically either the computer or somehow all of these entries for these foreign countries get transmuted into Munich, California, Stockholm, California, with these 000 zip codes, and that would appear not to relate at all to the individual whose stock or property is being escheated? Yeah, so the controller's office is really relying on the holder to provide that information. And my understanding is that the way that that's reported to the controller's office is they use a kind of a universal, the holders, the banks, and the financial institutions use a kind of a universal form to report the address and the owner's information. And that's the same form that's used across the United States. And so, again, the controller's office is reliant on the holder to put in that information and to properly make sure that that information is inputted accurately. So the controller's understanding of the address is coming solely from the holder? Correct, Your Honor. So then I take it it's your view that if these addresses get transmuted into Munich 000, it came from the holder, it wasn't something that happened within the controller's office? That's correct, Your Honor. So unless the court has any other questions, we would respectfully request that the court affirm the district court's decision. Thank you, sir. All right. Mr. Massey, you have a little bit of time left. Thank you. Two points. First, on the Stockholm, California, and how it gets in the computer point, you know, the court held in Taylor, too, that it was the controller's duty to provide notice. And if you're relying on a holder that you know is entering incorrect information, then it's like the postman example in Jones v. Flowers. You know, you see the letters going down the storm drain. You can't stand back and do nothing. And, in fact, the record shows that actually Charles Schwab had the right address in Munich, Germany. That's at Excerpts of Records 219. And the Munich, California falsification appears in the Veris report, in the auditor's report at the controller's unclaimed property tracking system, which is Excerpts of Records 62 and 63. But, in any event, this is a system that needs to be fixed. It's a disaster. It is threatening thousands upon tens of thousands of people around the world, property owners who are innocent, who have done nothing wrong, and their property is being taken. On the standing point, there is no – this case comes on summary judgment. And if there was a disputed fact about whether ING was a California domicile or subject to the jurisdiction of California, the State did not put that at issue. As this case comes to this Court, there is at least a disputed fact about whether the ING accounts that Mr. Peters holds are subject to SG or whether he's reasonable in constantly monitoring those accounts to make sure they don't get taken by the controller. I mean, you can't tell somebody who's lost, you know, the delta between $1.6 and $5 million that he's being unreasonable for looking like a hawk at his ING accounts to make sure California doesn't take them. I don't think that's speculative. I think any of us in that position would be doing exactly the same thing, saying, look, you took my retirement account before. I'm not letting you take any more of my money. And to tell me he's being unreasonable or speculative or this is too remote, that is a hard-hearted position to take. And I would think if there is a summary judgment issue, send the case back to the district court and say, let's have some fact-finding on what is the material risk of this cheat in this case. If that's really the problem, I think having this system that the State is not willing to acknowledge is highly problematic, is really a serious question. And also I would say the notion that every holder in the United States is getting the form wrong, and we can see thousands of entries, and it's all the holder's  It's not the controller Averis. That's really implausible. To me, it seems obvious that the controller is aware of this problem and could fix it, but needs court supervision to do it. So we urge this court to reverse. All right. Thank you, counsel. The matter of Peters versus Cohen is submitted for decision. And we are adjourned for the morning.
judges: McKEOWN, FORREST, SANCHEZ